UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DILLINGER, LLC,<br>    *Plaintiff*, | )<br>)<br>) |
| *vs.* | )     1:09-cv-01236-JMS-DKL<br>) |
| ELECTRONIC ARTS INC.,<br>    *Defendant.* | )<br>)<br>) |

## **ORDER**

Presently before the Court is Defendant Electronic Arts, Inc.'s ("EA"), motion for judgment on the pleadings. [Dkt. 89.]

**I.**
**STANDARD OF REVIEW**

"After the pleadings are closed…a party may move for judgment on the pleadings." Fed. R. Civ. Pro. 12(c). Where, as here, a motion for judgment on the pleadings attacks the sufficiency of the complaint, the motion "is subject to the same standard as a motion for dismissal for failure to state a claim [under Rule 12(b)(6)]." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989). Under that standard, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation and citation omitted).

When evaluating the plausibility of the plaintiff's claim, the plaintiff "receives the benefit of reasonable inferences" that arise from the well-pleaded allegations. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011) (citation omitted). Denials in the answer don't count, nor does an assertion of an affirmative defense, un-

less the plaintiff's own allegations establishes it, *see Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674-675 (7th Cir. 2009) ("Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." (citation omitted)).

## II.
### ALLEGATIONS IN THE COMPLAINT

As many people know, John Dillinger was a notorious Indiana gangster who terrorized the Midwest for several years, until he was gunned down by the F.B.I. in a Chicago firefight, in 1934. [*See* dkt. 63 at 1.]

Through the Complaint, Plaintiff Dillinger, L.L.C., alleges that it has registered two U.S. trademarks for "John Dillinger." [Dkt. 1 ¶15.] And thanks to a relatively recent Indiana statute, which recognized a descendible right of publicity, the Plaintiff also claims the right to control Mr. Dillinger's "personality" rights for commercial purposes—that is, his "name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, [and] mannerisms." [*Id.* ¶12.] It claims to have acquired those publicity rights by assignment from the heirs of Mr. Dillinger, who died intestate. [*See id.* ¶14; dkt. 99 at 6 n.4.]

The Plaintiff has sued EA for including unauthorized references to John Dillinger in its series of videogames based upon *The Godfather* novel and subsequent film series. [Dkt. 1 ¶¶17-18.] The references occur in the form of the names of two types of weapons that players can use to facilitate their own virtual crime spree as a mob boss. One is the "Dillinger Level Three Tommy Gun", which players can earn at no extra cost through game play. [*Id.* ¶19.]

Additionally, players of one particular iteration of the videogame series, "The Godfather II," can purchase upgraded weapons over the internet to enhance their effectiveness as virtual mob bosses. [*See id.* ¶22.] The Complaint includes a screenshot of an online store operated by either of two third parties, where users could buy various weapons upgrades for the game. One upgrade was the "Level 4 Firearms" pack, which retailed for $4.00. [*Id.*] It was described on the third-party websites in part as follows: "These five firearms are exactly what a Don needs to put his family on top! Each weapon can be equipped by you and your family. This collection includes the Modern Dillinger [Tommy Gun]...." [*Id.*]

The Plaintiff alleges that by continuing to include the Dillinger Level Three and Modern Dillinger in its "The Godfather" games, EA has continued to knowingly and willingly violate the Plaintiff's trademark in John Dillinger and its control over Mr. Dillinger's personality rights, despite being put on notice of the Plaintiff's objections. [*Id.* ¶¶ 26-27.]

### III.
#### DISCUSSION

The Plaintiff has raised six causes of action against EA, each of which stems from the references to the "Dillinger" weapons in EA's videogames. Count I accuses EA of violating Indiana's right-of-publicity statute, Ind. Code §§ 32-36-1-1 *et seq.* Count II says that EA has committed unjust enrichment. Counts III and V, which the parties treat together and so will the Court, accuse EA of trademark infringement. Count IV alleges unfair competition. Finally, Count VI raises a claim under Indiana's Crime Victim Act (the "ICVA"), Ind. Code § 34-24-3-1.

**A. Count I: Right-of-Publicity Statute**

In 1994, about sixty years after John Dillinger died, the Indiana General Assembly enacted the right-of-publicity statute. As is relevant here, it partially changed the common-law rule that "[w]hat a man does while alive becomes a part of history which survives his death" and

is subject to "[c]omment, fictionalization and even distortion" after his death, *Maritote v. Desilu Productions, Inc.*, 345 F.2d 418, 420 (7th Cir. 1965). The Indiana General Assembly decreed that "[a] person may not use an aspect of a personality's right of publicity [including the person's name] for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death without having obtained previous written consent from a person" vested with control of the personality's right to publicity. Ind. Code § 32-36-1-8(a).

Of the bases on which EA relies to challenge the right-of-publicity claim, its statute-of-limitations argument is the easiest to resolve here. Relying only on a statement in the Plaintiff's response brief—rather than the allegations of the Complaint itself—EA argues that the Plaintiff has conceded missing the two-year statute of limitations governing the claim, [dkt. 101 at 11 (arguing that the Plaintiff claimed misappropriation first accrued in 2006 but did not file suit until 2009)]. By surreply, the Plaintiff argues (among other things) that the continued sales of the games makes its right-of-publicity claim a "continuing wrong," such that the statute of limitations is tolled until the sales stop, *see Yoost v. Zalcberg*, 925 N.E.2d 763, 771 (Ind. Ct. App. 2010) ("The doctrine of continuing wrong applies where an entire course of conduct combines to produce an injury. When the doctrine attaches, the statute of limitations begins to run at the end of the continuing wrongful act." (citations omitted)). Because of the briefing posture, however, EA hasn't had a chance yet to respond to the Plaintiff's legal authority presented via surreply, thus depriving the Court of the benefit of adversarial presentation. Rather than permit additional briefing, the Court will apply the general rule that a statute-of-limitations argument should be raised via a motion for summary judgment, especially because EA's argument doesn't actually depend on the allegations in any of the Plaintiff's pleadings, *see* Fed. R. Civ. Pro. 7(a) (not including briefs in the list of recognized pleadings). Accordingly, to the extent that EA seeks a

dismissal on statute-of-limitations grounds on this first count of the Complaint (or any other), the Court denies the motion without prejudice.

EA makes two other arguments against the right-of-publicity claim, which are both properly raised through a motion for judgment on the pleadings: that the statute doesn't apply to personalities who died before the statute was enacted and, even if it did, that the "literary works" exception included in the statute covers videogames, Ind. Code § 32-36-1-1(c)(1)(A) (exempting "[l]iterary works, theatrical works, musical compositions, film, radio, or television programs"). As this Court possesses only supplemental jurisdiction over Count I,[1] the Court must predict how the Indiana Supreme Court "would decide the case, and decide it the same way." *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 655 (7th Cir. 2000) (citations omitted). The Indiana Supreme Court, however, hasn't ever had occasion to consider either issue, nor has the Indiana Court of Appeals, whose decisions are good indicators of what the state supreme court would decide, *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).[2] The Court must, therefore, base its decisions on whatever authority is available. *See id.*

### 1. Whether the Statute Applies to Personalities Who Died Before 1994

In support of its claim that the right-of-publicity statute doesn't apply to personalities like John Dillinger who died before the statute's enactment, EA directs the Court to *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2007). In that case, the

---

[1] The Plaintiff's Complaint pleads federal subject-matter jurisdiction and supplemental jurisdiction. Because it hasn't properly set forth the Plaintiff's citizenship or the amount in controversy, the Complaint doesn't invoke diversity jurisdiction. [*See* dkt. 1 ¶¶6, 9.]

[2] Neither party has argued that the Court could or should certify either issue to the Indiana Supreme Court. *See* Ind. App. R. 64(A) ("[A]ny federal district court may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent."). Given the delay and extra expense to the parties associated with a certification, the Court will respect their implicit preference.

court rejected an attempt by an entity claiming to have obtained, via will, Marilyn Monroe's right of publicity. The court reasoned that because publicity rights terminated at death at common law, Ms. Monroe's death before the Indiana statute was enacted meant that she lacked any publicity right to devise in her will. *Id.* at 314 ("Thus, at the time of her death in 1962 Ms. Monroe did not have any postmortem right of publicity under the law of any relevant state [including Indiana]. As a result, any publicity rights she enjoyed during her lifetime were extinguished at her death by operation of law.").

The Plaintiff counters EA's authority with non-precedential authority of its own: a decision of an Indiana trial court that found liability where the Lake County Convention Center referred to "Dillinger" in its tourism advertisements and ran a "Dillinger" museum. The trial court there held that "[t]he Indiana Right of Publicity Statute should…be read retroactively" so as to also protect the publicity rights of the individuals who died before its enactment, including John Dillinger. *Scalf v. Lake County Convention & Visitors Bureau, Inc.*, 45D10-0406-PL-00093 (Lake Super. Ct. Jan. 9, 2006) *available at* [dkt. 100-2]. In reaching its holding, the court relied upon several statutory provisions, which it concluded made clear the General Assembly's intent. The statute defines a "personality" as "a living or deceased natural person" who has attributes with "commercial value, whether or not the person uses or authorizes the use of the person's right of publicity for a commercial purpose during the person's lifetime," Ind. Code § 32-36-1-6. The publicity rights endure for 100 years following the personality's death. Ind. Code § 32-36-1-8. And publicity rights now constitute property, "freely transferable and descendible," including by will and intestate succession. Ind. Code § 32-36-1-16.

After reviewing the pair of decisions that the parties have cited, the Court finds that the Indiana Supreme Court would agree with *Shaw*: Indiana's right-of-publicity statute doesn't ap-

ply to personalities who died before its enactment. The statutory provisions, individually and collectively, that *Scalf* cited are ambiguous; they can be read equally to protect personalities who live and die after the statute's 1994 enactment, as they can be read to protect those who have ever lived. Providing causes of action for the heirs of the millions of people who died between 1894 and 1994—*i.e.* during the 100 year post-death period of protection—would greatly expand the potential liabilities that the statute creates.[3] At present, given the existence of a reasonable alternative reading of the statute, the Court must presume that the Indiana Supreme Court would not endorse such a result but would instead adopt the narrower reading. *See Todd v. Societe BIC, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc) ("When given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path (at least until the [state supreme court] tells us differently)".).[4]

The Court also rejects *Scalf* for another reason insofar as it recognizes publicity rights of individuals who died before 1994: The decision permits inheritances outside of probate, despite the important functions that probate serves. First, Indiana levies an inheritance tax on the property that is transferred (among other ways) "under a deceased transferor's will or under the laws of intestate succession, as a result of the transferor's death." Ind. Code § 6-4.1-2-4(a)(1). Recognizing new property after probate has concluded would frustrate Indiana's ability to collect the tax, unless claimants of that property submit to probate. *See* Ind. Code § 6-4.1-4-1 (requiring

---

[3] The statute "applies to an act or event that occurs within Indiana, regardless of a personality's domicile, residence, or citizenship." Ind. Code § 32-36-1-1(a). Given the potential worldwide class of potential plaintiffs, billions may be a better measure.

[4] Given the presumption, the Court needn't consider whether interpreting the statute to protect the rights of individuals whose deaths pre-deceased the statute would actually make the statute truly "retroactive" lawmaking and, if so, whether "strong and compelling reasons" justify it, *Bourbon Mini-Mart v. Gast Fuel & Servs.*, 783 N.E.2d 253, 260 (Ind. 2003) (citations omitted).

personal representative to file an inheritance tax return in the probate court within nine months of the decedent's death). Second, probate also ensures that creditors who have claims against the decedent are paid—which in Mr. Dillinger's case might include the victims of his numerous crimes and possible unpaid criminal fines. *See* Ind. Code § 29-1-7-7.5 (requiring personal representatives to notify creditors of probate); § 29-1-17-2(a) (requiring taxes and claims to be paid before distributions to heirs or beneficiaries). Finally, probate conclusively determines the heirs (or, in the case of a will, the beneficiaries) who receive the decedent's remaining property, once all claims have been paid.

With respect to the last reason, the Court notes that the parties here disagree about the chain of intestate succession for Mr. Dillinger. [*Compare* dkt. 154 ¶6, *with* dkt. 168 at 10.] Which version of the Probate Code governs intestate succession: the one in force when Mr. Dillinger died or the one when the General Assembly created the right-of-publicity? *Compare* Ind. Code § 6-2303 (1933) (repealed),[5] *with* Ind. Code § 29-1-2-1(d)(3).[6] The answer could bear on whether Plaintiff's claimed ownership interest is sufficient to otherwise control the publicity rights. But a probate court—not a federal one—is the appropriate forum to resolve those questions. *Cf. Marshall v. Marshall*, 547 U.S. 293 (2006) (narrowing the "probate exception" to federal jurisdiction while reaffirming the principle that probate is normally a matter for state courts).

---

[5] "If any intestate shall die without lawful issue or their descendants alive, one-half of the estate shall go to the father and mother of such intestate, as joint-tenants, or, if either be dead, to the survivor, and the other half to the brothers and sisters and to the descendants of such as are dead, as tenants-in-common."

[6] "If there is no surviving spouse or issue of the intestate, then to the surviving parents, brothers, and sisters, and the issue of deceased brothers and sisters of the intestate. Each living parent of the intestate shall be treated as of the same degree as a brother or sister and shall be entitled to the same share as a brother or sister. However, the share of each parent shall be not less than one-fourth (1/4) of the decedent's net estate. Issue of deceased brothers and sisters shall take by representation."

So whether or not the statute applies retroactively, absent an allegation that probate has been re-opened to permit the just administration of the new property recognized by the General Assembly through the right-of-publicity statute, the Complaint fails to state a claim. *See* Ind. Code § 29-1-17-14 (permitting closed estates to be reopened to supervise the distribution of after discovered property). *Cf. also Estate of Ellington v. Gibson Piano Ventures, Inc.*, 2005 U.S. Dist. LEXIS 21003, *34 (S.D. Ind. 2005) (finding issues of fact existed regarding a right-of-publicity claim by the Estate of Duke Ellington, who died in 1974, although not specifically addressing the "retroactivity" issue).[7] No such allegation appears here.

Because the Plaintiff seeks to enforce publicity rights of John Dillinger, who died in 1934, well before the enactment of the right-of-publicity statute, the Plaintiff has failed to state a claim under that statute. Even if the statute could protect other personalities who died before its enactment, the Complaint nonetheless impermissibly fails to allege that the purported heirs of Mr. Dillinger's right of publicity have ever submitted that property right to probate.

### 2. Whether the Exception for Literary Works Includes Videogames

EA has an alternative argument to defeat Count I; it argues that its videogame qualifies a "literary work[]" and thus cannot form the basis for a lawsuit brought under the right-of-publicity statute. Ind. Code § 32-36-1-1(c)(1)(A).

Citing various dictionary definitions of "literary" and "literature," the Plaintiff responds that videogames don't normally qualify for such labels, which are at the heart of "literary works." [*See* dkt. 99 at 7.] If the General Assembly had wanted to include them, it argues, the General Assembly would have done so with much more straightforward language.

---

[7] An affidavit filed in that case indicates that Mr. Ellington died intestate. 1:03-cv-00804-WTL-DFH [dkt. 84-1 ¶2].

But, as EA correctly notes, it's not unheard of to call videogames literary works. Indeed, Congress has referred to them that way. *qad, Inc. v. ALN Assoc., Inc.*, 974 F.2d 834, 835 (7th Cir. 1992) (citation omitted) ("Congress extended copyright protection to 'literary works' in 17 U.S.C. § 102(a)(1), a category which includes computer programs.").

Deciding whether to adopt the broader definition of literary works that EA proposes or the narrower one that the Plaintiff offers has significant constitutional implications. Any holding that "literary works" in the statute don't encompass videogames would set the right-of-publicity statute up for a constitutional challenge because videogames have just as much protection under the First Amendment as does "highbrow literature," *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). While the Plaintiff argues that true First Amendment problems can be cured through case-by-case invocations of a constitutional affirmative defense, [dkt. 99 at 7-8], as EA has done here (in a pending motion for summary judgment), it is unlikely that the Indiana Supreme Court would adopt the Plaintiff's approach. When faced with ambiguous statutory language, the Indiana Supreme Court follows the "familiar canon of statutory interpretation that statutes should be interpreted so as to avoid constitutional issues." *City of Vincennes v. Emmons*, 841 N.E.2d 155, 162 (Ind. 2006) (citations omitted). Additionally, interpreting "literary works" broadly would effectuate the General Assembly's obvious attempt to avoid potential constitutional infirmities with the statute. The other exceptions in the same subsection all involve materials that are also protected under the First Amendment: "theatrical works, musical compositions, film, radio, or television programs[;]…[m]aterial that has political or newsworthy value[;]…original works of fine art[; and]…[p]romotional material or an advertisement for a news reporting or an entertainment medium[; or] [a]n advertisement or commercial announcement for a use described in this subdivision." Ind. Code § 32-36-1-1(c)(1). *See, e.g.*, *Ward v.*

*Rock against Racism*, 491 U.S. 781, 790 (1989) (music); *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989) (commercial speech); *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 578 (1977) (news and broadcast entertainment); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975) (theatrical works); *Jenkins v. Georgia*, 418 U.S. 153, 156 (1974) (film); *Miller v. California*, 413 U.S. 15, 24 (1973) (material with "literary, artistic, political, or scientific value").

Given that "literary works" can easily be read to encompass videogames, the Court finds that the Indiana Supreme Court would adopt such a reading of the exception, to avoid constitutional issues with the narrower definition. That exception, therefore, defeats the Plaintiff's right-of-publicity claim, which is lodged exclusively against EA's videogames.

### B. Count II: Unjust Enrichment

As a tag along to its right-of-publicity claim, the Plaintiff also asserts a cause of action for unjust enrichment, in Count II. That cause of action is premised upon what the Plaintiff contends was EA's wrongful "use of the Dillinger Personality…in violation of Indiana's Right of Publicity Statute." [Dkt. 1 ¶¶34-35.] EA has argued—and the Plaintiff hasn't disputed—that if Count I fails, then Count II must also fail. [*Compare* dkt. 90 at 11, *with* dkt. 99 at 12-14.] Because the Court has dismissed Count I, it will accordingly dismiss Count II as well.

### C. Counts III & V: Federal Trademark Claims[8]

---

[8] Although Count III also references the Indiana Trademark Act, Ind. Code § 24-2-1-0.5 *et seq.*, and common-law trademark protections, the Plaintiff hasn't attempted to develop any argument about either. Accordingly, to whatever extent that they might confer greater benefits than federal trademark law, the Court deems the Plaintiff's lack of cogent argument an abandonment of any claim to recovery under those theories for purposes of the Court's ruling on this motion. *See Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) ("[U]nderdeveloped arguments are considered waived." (citation omitted)).

As is relevant here, federal trademark law prohibits the use of another's trademark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). It also prohibits a person from using in commerce of "any word, term, name, symbol, or device…, which…is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *Id.* § 1125(a)(1)(A). The Plaintiff claims that EA's references to "Dillinger" weapons violated those statutes, in Counts III and V, respectively. [*See* dkt. 1 at 9, 11.]

Although the two statutes at issue in these Counts are worded slightly differently, they both ultimately require the trademark plaintiff to "establish that (1) [its] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers," *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001), whether before or after the sale of the offending product, *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001) (citations omitted). The likelihood-of-confusion analysis "is an equitable balancing test," which considers seven factors:

> (1) similarity between the marks in appearance and suggestion;
> (2) similarity of the products;
> (3) the area and manner of concurrent use;
> (4) the degree of care likely to be exercised by consumers;
> (5) the strength of the plaintiff's mark;
> (6) whether actual confusion exists; and
> (7) whether the defendant intended to 'palm off' [its] product as that of the plaintiff.

*Id.* at 677-78. Although none of the factors is dispositive, "the similarity of the marks, the defendant's intent, and actual confusion" are the most important when deciding, *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000)—as a matter of fact—that likelih-

ood of confusion exists, *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir. 1985) ("[T]he question of likelihood of confusion is all fact and no law.").

Even if the plaintiff can establish those elements, however, federal law recognizes several affirmative defenses to trademark liability. Among them is fair use, which EA has asserted. [*See* dkt. 67 at 9].[9] That defense provides a shield to liability if EA can prove that it used the Plaintiff's trademark (1) "in a non-trademark use; (2) the phrase is descriptive of their goods or services; and (3) [it] used the phrase fairly and in good faith only to describe their goods or services." *Packman*, 267 F.3d at 639 (citations and quotation omitted).

EA here makes a narrow challenge to the Plaintiff's trademark claims. It doesn't challenge the first element of the Plaintiff's prima facie case, the Plaintiff's trademark in "John Dillinger." Instead it challenges the second, the likelihood-of-confusion element. And as to that element, EA argues only that the Plaintiff cannot—as a matter of law—establish likelihood of confusion because the Complaint has no allegation that EA itself used John Dillinger as a trademark, in other words, that EA used John Dillinger as a way "to identify and distinguish [its] goods…from those manufactured or sold by others….," 15 U.S.C. § 1127. [*See* dkt. 101 at 8 ("Without trademark use [as a trademark]…there can be no finding of infringement.").][10]

The Court rejects EA's argument. First, whether or not EA has correctly interpreted the various out-of-Circuit district-court decisions that EA has cited in support of its argument, the Seventh Circuit apparently views the law otherwise. A defendant's "non-trademark use" is an

---

[9] In a separate motion for summary judgment, EA has also asserted an affirmative defense under the First Amendment. The applicability of the fair-use affirmative defense itself isn't currently before the Court. *See Cancer Found., Inc.* 559 F.3d at 674-675 (explaining that complaints need not anticipate and plead around affirmative defenses to survive a motion to dismiss).

[10] EA doesn't dispute that the Complaint properly alleges that it has used "in commerce" the Plaintiff's trademark "in connection with any goods or services." 15 U.S.C. § 1114(1)(a). *See also id.* at § 1125(a)(1). The argument is only that EA's use of "John Dillinger" wasn't "as" EA's trademark.

element of the fair-use affirmative defense, the lack of which doesn't necessarily preclude establishing the plaintiff's prima facie case. *Packman*, 267 F.3d at 639; *see also Sunmark, Inc. v. Ocean Spray Cranberries*, 64 F.3d 1055, 1058 (7th Cir. 1995) (stating that if a defendant used the words of the trademark "simply as descriptions, and otherwise than as a mark,…there can be no violation of the Lanham Act under what is known as the fair use defense"). If a Plaintiff always had to prove "trademark use" as part of its prima facie case, the "non-trademark use" element in the affirmative defense would be redundant. Indeed, it could also preclude a trademark infringement action against printers and publishers—who may reprint a registered trademark without any intention of using it to designate their own goods—even though they too can be liable for trademark infringement. *See* 15 U.S.C. § 1114(2)(A)-(B) (limiting liability to injunctive relief upon proof that printer or publisher is an "innocent" infringer).

Second, given the required benefit of the inferences from the Complaint applicable to the present motion, the Complaint actually alleges at least some potential "trademark use" by EA: Users can connect to the internet and select weapons to buy as upgrades for the "The Godfather II," weapons that explicitly use the "Dillinger" name. [Dkt. 1 ¶22.] Contrary to EA's assertions, therefore, the Complaint does contain allegations of the Plaintiff's mark "in marketing, advertising, or other means of selling its product" and could, under even EA's view, state a claim. [*Id.* at 90 (quoting *Felix the Cat Prods. Inc. v. New Line Cinema Corp.*, 54 U.S.P.Q. 2d 1856, 2000 WL 770481 (C.D. Cal. 2000)).][11]

Because Counts III and V are not subject to dismissal on the grounds that they fail to allege that EA used the Plaintiff's mark "as" a trademark, and because EA argues no other basis

---

[11] There is no allegation that EA actually controls the marketing or runs any advertisements for the game upgrades. But, on the present record, the Court will find EA's alleged authorization of game content on the third-party websites constitutes an "other means of selling" its product.

here that might justify their dismissal, the Court denies EA's motion with respect to Counts III and V.

### D. Count IV: Unfair Competition

EA's only argument regarding Count IV, which alleges unfair competition, is that Count IV must fail if Counts III and V fail. [*See* dkt. 90 at 10.] Because the latter two claims survive, so does the former. EA's motion is denied with respect to Count IV.

### E. Count VI: ICVA

Civil plaintiffs who can prove, by a preponderance of the evidence, that they have been the victims of certain property crimes committed by defendants—whether or not the crimes were ever criminally charged—can recover up to three times the amount of any pecuniary losses. *See White v. Indiana Realty Assoc. II*, 555 N.E.2d 454, 456 (Ind. 1990) (citations omitted); Ind. Code § 34-24-3-1. Through its Count VI, the Plaintiff here claims EA committed three such property crimes with respect to its publicity rights and trademarks: conversion, Ind. Code § 35-43-4-3; theft, Ind. Code § 35-43-4-2;[12] and deception, Ind. Code § 35-43-5-3. [Dkt. 99 at 14-16.] Given that the Court has already found that the Plaintiff has no publicity rights with respect to John Dillinger, the Court will only address the Plaintiff's claims insofar as they relate to alleged trademark infringement.

Criminal conversion occurs when "[a] person…knowingly or intentionally exerts unauthorized control over property of another person." Ind. Code § 35-43-4-3(a). While EA offers other additional arguments about why the Complaint fails to plead conversion, the Court will on-

---

[12] The Complaint erroneously referred to criminal mischief. The Plaintiff has explicitly disclaimed any potential claim for criminal mischief. [Dkt. 99 at 14 n.13.] Although EA objects that the Plaintiff shouldn't be permitted to "amend" its Complaint in response to the motion for judgment on the pleadings, the objection is moot inasmuch as the Plaintiff has failed to state a claim for theft, for reasons that will be explained.

ly address one, which is clearly dispositive. EA has argued, [*see* dkt. 101 at 11 n.5], that the Plaintiff has included no allegations that EA ever "exerted control" over the Plaintiff's trademark. That element requires a defendant "to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Ind. Code § 35-43-4-1. Merely using another's trademark without permission, which is what the Plaintiff has alleged EA did here, doesn't constitute any of those activities. *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2009 U.S. Dist. LEXIS 88695, *4 (S.D. Ind. 2009) (Lawrence, J.) (granting motion to dismiss ICVA claim regarding conversion of trademark and trade dress). *See also Heckler & Koch, Inc. v. Coharie Arms, Inc.*, 2010 U.S. Dist. LEXIS 23460, *5-7 (S.D. Ind. 2010) (Young, C.J.) (dismissing ICVA claim for conversion of trade dress because the defendant's infringing use was in no way "in exclusion and defiance of the owner's rights" and was thus not unauthorized control).[13] The Plaintiff has, therefore, failed to state a claim for conversion of its trademark.

Conversion is a lesser-included-offense to theft. *See Moser v. State*, 433 N.E.2d 68, 69 (Ind. Ct. App. 1982) ("Absence of the element of 'intent to deprive' distinguishes criminal conversion from theft."). Because, as discussed above, the Plaintiff can't establish conversion, it necessarily can't establish theft either.

The remaining alleged criminal act is deception, a crime which can occur in eleven statutorily defined ways. *See* Ind. Code § 35-43-5-3(a). The Plaintiff argues that only two are at issue in this action: "(6) with intent to defraud, misrepresent[ing] the identity or quality of property…;[or] (9) disseminat[ing] to the public an advertisement that the person knows is false, mis-

---

[13] At oral argument, Plaintiff's counsel conceded that "[t]here's always questions as to whether you can convert a trademark." [Dkt. 210 at 63.] Although counsel believed that the issue was not the subject of the motion, [*see id.*], the Court finds otherwise.

leading, or deceptive, with intent to promote the purchase or sale of property…." *Id.* § 35-43-5-3(a)(6), (9).

EA correctly argues that the Complaint lacks any allegation that it used the Plaintiff's trademark "with the intent to defraud." [Dkt. 90 at 12.] Indeed, the Plaintiff makes no claim to the contrary; it only claims that the use was likely to cause confusion. [*See* dkt. 99 at 16 (not claiming any fraudulent intent).] The Complaint is, therefore, missing a required statutory element and cannot state a claim for deception under § 35-43-5-3(a)(6).

With respect to the "false, misleading, or deceptive" advertising branch of deception, EA objects that the Complaint has no allegations of EA "advertising" using the John Dillinger name. [Dkt. 90 at 13.] Again, the Plaintiff makes no claim to the contrary. The Plaintiff's collection of the "necessary facts to establish a claim of deception" that it contends are present in the Complaint omits any reference to any advertisement on EA's part.[14] This claim under § 35-43-5-3(a)(9) thus omits a statutory element and fails as a matter of law.

Accordingly, the Court will dismiss Count VI.

## IV.
### CONCLUSION

The Court now **GRANTS IN PART AND DENIES IN PART** EA's motion for judgment on the pleadings. [Dkt. 89.] The motion is granted with respect to Counts I, II, and VI. It is also granted with respect to Count III only to the extent that Count III alleges violations of state law. In all other respects, the motion is denied.

Given that the Court has ruled in EA's favor with respect to Count I, several other motions can now be summarily resolved. Plaintiff's Motion for Partial Summary Judgment on Lia-

---

[14] EA has asserted, and the Plaintiff doesn't dispute, that its Complaint must satisfy the specificity requirements of Fed. R. 9(b) with respect to the deception claim. [*See* dkt. 99 at 16.]

bility Under Count I, [dkt. 152], is **DENIED**. EA's motion for a continuance to respond to Plaintiff's motion for partial summary judgment, [dkt. 171], is **DENIED AS MOOT**. EA's motion to enjoin certain state court proceedings that might interfere with the Court's ability to resolve Count I, styled as its Motion to Enjoin State Court Action *Dillinger, LLC v. Thompson*, [dkt. 186], is **DENIED AS MOOT**, and the Plaintiff's motion for leave to file a surreply to that motion,[dkt. 213], is likewise **DENIED AS MOOT** .

06/15/2011

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Peyton Louis Berg
BOSE MCKINNEY & EVANS, LLP
pberg@boselaw.com

Keirian Antares Brown
TAFT STETTINIUS & HOLLISTER LLP
kbrown@taftlaw.com

Adam Clay
INDIANA ATTORNEY GENERAL
Adam.Clay@atg.in.gov

Marsha Stelson Edney
U.S. DEPARTMENT OF JUSTICE
marsha.edney@usdoj.gov

Ronald E. Elberger
BOSE MCKINNEY & EVANS, LLP
relberger@boselaw.com

R. Adam Lauridsen
KEKER & VAN NEST LLP

alauridsen@kvn.com

Melissa J. Miksch
KEKER & VAN NEST LLP
mmiksch@kvn.com

Erin C. Nave
TAFT STETTINIUS & HOLLISTER LLP
enave@taftlaw.com

Craig Eldon Pinkus
BOSE MCKINNEY & EVANS, LLP
cpinkus@boselaw.com

Jonathan G. Polak
TAFT STETTINIUS & HOLLISTER LLP
jpolak@taftlaw.com

R. James Slaughter
KEKER & VAN NEST LLP
rslaughter@kvn.com