UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DILLINGER, LLC,<br>    *Plaintiff*, | )<br>)<br>) |
| *vs.* | )   1:09-cv-1236-JMS-DKL<br>) |
| ELECTRONIC ARTS INC.,<br>    *Defendant.* | )<br>)<br>) |

**ORDER**

    Plaintiff brings this action against Electronic Arts, Inc. ("EA") for allegedly using its trademarked name "Dillinger" to name weapons featured in EA's *The Godfather* video games in violation of federal and state law. [Dkt. 1.] Plaintiff's Complaint lists six counts, three of which (Counts I, II, and VI) have recently been dismissed. [Dkt. 222.] The three remaining claims (Counts III-V) arise under the Lanham Act and a common-law claim for unfair competition that is grounded in a prohibition against trademark misappropriation, which Plaintiff argues bars EA from using the Dillinger name in its games. [Dkt. 1 at 10-11.] Presently before the Court are the parties' cross-motions for summary judgment on EA's First Amendment defense to its use of the Dillinger name. [Dkt. 85; dkt. 144.]

**I.
STANDARD OF REVIEW**

    A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would, as a matter of law, conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue

1

for trial . . . against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial and cannot rely upon the mere allegations or denials in the pleadings. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. at 330. The key inquiry is the existence of evidence to support a plaintiff's claims or a defendant's defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). In accordance with Rule 56(e), if a party fails to address the adverse party's assertion of fact, the Court will consider it undisputed for the purposes of the motion.

Cross-motions for summary judgment do not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston*, 384 F.3d 838, 842 (7th Cir. 2004). The Court must evaluate each motion independently, making all reasonable inferences in favor of the nonmoving party with respect to each motion. *Id.* at 483.

After having assessed the claims of the parties in accordance with the standards outlined above, the Court concludes that EA is entitled to summary judgment on its First Amendment defense. Therefore, in what follows, the Court makes all reasonable factual inferences in favor of Plaintiff.

## II.
### BACKGROUND

### A) John Dillinger and his Connection with the Tommy Gun

Plaintiff claims to own the publicity rights of the "late depression-era bandit" John Dillinger, as well as the trademark rights in the words "John Dillinger." [Dkt. 1 at ¶ 6.]

2

John Dillinger was a legendary gentleman-bandit, [dkt. 1 at ¶ 1]; according to the FBI, Dillinger was a "notorious and vicious thief"—a "lurid desperado" who "came to evoke the gangster era." [Dkt. 88-2 at 39.] Indeed, during the mid-1930's, he and his violent gang terrorized the Midwest, robbing, killing and staging jail-breaks. [*Id.*]

In addition to his glamorous life of crime, John Dillinger is commonly associated with Thompson submachine guns, also known as "Tommy Guns," which were seized *en masse* from his hideouts by the police. [*Id.* at 40.] Plaintiff's website thus features an iconic photograph of John Dillinger holding a Tommy Gun, [*id.* at 47], and the Tommy Gun manufacturer's website itself calls the gun "Dillinger's Choice." [Dkt. 88-3 at 5; *see also* dkt. 88-3 at 10 ("Thompsons . . . were a favorite item for Public Enemy No. 1, John Dillinger.").]

Depictions of John Dillinger in popular culture have reinforced his connection with the Tommy Gun over the years. In the 1995 movie *Dillinger and Capone*, Dillinger is featured alongside notorious mafioso Al Capone, and the former uses a Tommy gun throughout the film. [Dkt. 88-4 at 2; dkt. 88-5 at 18.] Dillinger is also depicted using Tommy guns in films including *Dillinger* (1973) and *Public Enemies* (2009). [Dkt. 88-10 at 2; dkt. 88-7 at 29.]

As EA Executive Producer Joel Wade put it, "the popular persona of John Dillinger . . . [became] this flashy gangster who dressed well, womanized, drove around in fast cars, and sprayed Tommy Guns." [Dkt. 175 at 4.]

**B) The Godfather Video Games**

EA is the developer and publisher of video games, including "*The Godfather*" and "*The Godfather II*" (collectively, "*Godfather* games"), which were released in 2006 and 2009 respectively.

The *Godfather* games are based on Francis Ford Coppola's film adaptations of the 1969 novel, *The Godfather* ("*Godfather* novel"), written by Mario Puzo. [Dkt. 87 at ¶¶ 9; dkt. 1 at ¶ 1.] The novel and films portray a fictional New York mafia family, the Corleones, and in particular, the rise of Michael Corleone, who returns from World War II and ultimately replaces his father, Vito Corleone, as the leader of the Corleone family—the "Godfather." [Dkt. 87 at ¶ 9.] Among other things, the novel describes a fictional rivalry between Al Capone's Chicago-based syndicate and the Corleone family's New York-based operation. [Dkt. 88-7 at 7-9.] Both *Godfather* films include widespread use of Tommy Guns. [Dkt. 87 at ¶ 20.]

The *Godfather* games combine technically advanced software and creative audio-visual elements, which are constructed from thousands of video graphics, audio features, and data. [*Id.* at ¶ 10-11.] Both games feature an extensive musical soundtrack, sound effects, and include new dialogue, written specifically for the game. [*Id.*]

The first *Godfather* game, like the film, simulates the mafia world in New York during the mid-1900s. [*Id.* at ¶ 9.] The player acts as a member of the Corleone family, guiding this so-called "in-game character" through a variety of missions predicated on the plot of the original *Godfather* film. [*Id.* at ¶ 10.] To complete the missions, the player "intimidates, bribes, and fights his way to the top"—robbing banks, evading law enforcement, and "utilizing period-appropriate vehicles and weapons" to do so. [*Id.* at ¶ 11.]

In the first *Godfather* game, the player may choose and use a Tommy Gun identified as the Level Three "Dillinger Tommy Gun." [*Id.* at ¶ 12.] The "Dillinger Tommy Gun" is one of fifteen firearms in this game. [*Id.* at ¶ 17.] It is distinguishable from other weapons based on characteristics such as a seventy-five round clip and a rapid rate of fire. [Dkt. 1 at ¶ 20.] The gun's label appears as a single piece of text to identify the weapon, and the words "Dillinger

Tommy Gun" are not spoken by any character in the game, [dkt. 87 at ¶ 12]. The "Dillinger Tommy Gun" itself does not appear in any of the *Godfather* game's advertising or promotion materials. [*Id.*]

In *The Godfather II*, the player manipulates the in-game character along the same plot-line as the movies but, "having risen to the top of the organized-crime underworld," further aims to control criminal networks in New York, Miami, and Cuba during the 1960s. [*Id.* at ¶ 16.] In this version, the player may control a single in-game character or play in "The Don View," which allows the player to direct other members of the Corleone family. [*Id.*] To seize control of the various territories, players select and use period-appropriate vehicles and weapons. [*Id.*]

In addition to the fifteen firearms included in *The Godfather II*, players may choose to purchase additional period-appropriate weapons as part of the "Level 4 Weapons Bundle." [*Id.* at ¶ 7.] This downloadable bundle of weapons includes the "Modern Dillinger," as well as four other weapons. [*Id.*] The "Modern Dillinger Tommy Gun" is distinguishable from other weapons based on characteristics such as a seventy-five round clip and a rapid rate of fire. [*Id.* at ¶ 23.] The "Modern Dillinger" does not appear in any of this game's advertising or promotion materials, [dkt. 146-1 at ¶ 14]; however, "Modern Dillinger" appears in press releases concerning downloadable content and is listed first among all weapons, [dkt. 146-2 at 7].

John Dillinger does not appear and is not referenced in the *Godfather* movies or novel; he lived before the time period within which the games are set; and he committed crimes primarily in the Midwest, not on the East Coast. [Dkt. 144 at 4-7; dkt. 182 at 3.] Plaintiff thus claims EA's use of the Dillinger name violates trademark law.

### III.
### DISCUSSION

Although the Seventh Circuit protects video games as "literary works" under the First Amendment, *see Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001), Plaintiff argues that EA is not entitled to First Amendment protection of its use of the Dillinger trademark because the use of the mark has no artistic relevance to the *Godfather* games; even if it does, Plaintiff argues, the use of the name should not be protected because it "explicitly misleads players regarding the content of the games and Dillinger's approval of the mark's usage." [Dkt. 144 at 7.]

The parties agree that EA's First Amendment defense to Plaintiffs trademark claim is controlled by *Rogers v. Grimaldi*, 875 F.2d 994 (2nd. Cir. 1989).[1] [Dkt. 86 at 2; dkt. 144 at 17-18; dkt. 182 at 2 ("To qualify for First Amendment Protection under *Rogers v. Grimaldi* on summary judgment, EA must establish as a matter of law that its use of Dillinger was "related" in some way to the "content of the expressive work." (citation omitted)).] The *Rogers* "relatedness" test bars trademark claims unless the use of the plaintiff's likeness is "wholly unrelated to the [work] or [is] simply a disguised commercial advertisement for the sale of goods or services." *Id.* at 1004. To properly analyze this issue, the Court must therefore consider a two-part test: First, the Court must determine whether the use of the mark has any artistic relevance to the underlying work whatsoever; second, if the use of the trademark has some relevance, the Court

---

[1] Although the parties agree that the Court should adopt the test set forth by the Second Circuit in *Rogers*, the Seventh Circuit has not yet spoken on the propriety of this test. Consistent with the longstanding principle of party presentation, *see Greenlaw v. United States*, 554 U.S. 237, 243-244 (2008), the Court will accept the parties' position as to *Rogers* application, and assume that *Rogers* controls without definitely deciding the question. Furthermore, if this Court had not already dismissed Plaintiff's right of publicity claim (Count I), [*see* dkt. 222], the Court notes that it would have analyzed that claim under *Rogers* also since Plaintiff argues, and EA does not dispute, that the *Rogers* test would have been the most appropriate test there as well. [Dkt. 144 at 17 ("The *Rogers* test is best suited to analyze the First Amendment issues in this case because it addresses important public policy concerns about permitting intentional use of another's intellectual property for commercial profit.").]

6

must determine whether it explicitly misleads the public as to the source or content of the work. *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos*, 547 F.3d 1095, 1099 (9th Cir. 2008) (citing *Rogers*, 875 F.2d at 999, 1004 (2d Cir. 1989)).

### A) Does the Dillinger Name Have Any Relevance to *The Godfather* Games?

Plaintiff argues that the name "Dillinger" has no artistic relevance to the *Godfather* games because the use of the Dillinger name is not a reasonably necessary component of the games and because "[EA] does not know why it chose to use 'Dillinger' in the first place." [Dkt. 144 at 8, 12.]

#### 1. Relationship between Dillinger and the *Godfather* Games

Plaintiff argues that the use of the Dillinger name has no artistic relevance because it is "not a reasonably necessary aspect of the game[s]."[2] [Dkt. 144 at 12.] More precisely, it argues, the name's use bears no relationship to the game because the mark appears nowhere in the games other than to identify the Level Three Dillinger Tommy Gun and the Modern Dillinger; because John Dillinger himself appears nowhere in the *Godfather* novel, movies, or video game story-line; and because John Dillinger was not alive during the period which any of those works was set. [Dkt. 144 at 12-13.] Because Tommy Guns are "but isolated elements in the work" with no relation to the story-line, Plaintiff maintains that EA relies on a mere "logical connection be-

---

[2] In its reply, Plaintiff clarifies that it is not making an "alternative means" argument—i.e., that the use of the mark must be the only way, or a reasonable way, to express the content of the work. [Dkt. 182 at 16.] For good reason: Courts adopting the *Rogers* test have rejected the alternative means argument. *See, e.g., E.S.S. Entm't 2000, Inc., v. Rock Star Videos, Inc.,* 547 F.3d 1095 (9th Cir. 2008) ("The court's inquiry is limited to determining whether the title has *some* relevance to the underlying work; it does not extend to assessing whether the use of the trade dress or mark is absolutely necessary to the goals of the artist.") Plaintiff rightly concedes that it must make a showing that "*zero* relationship [exists] between John Dillinger and the premise for the *Godfather* video games." [Dkt. 182 at 1, 16.]

7

tween John Dillinger and Tommy Guns," which "cannot serve as the basis for establishing a relationship under the *Rogers* test." [Dkt. 182 at 7, citing 164 at 8-9, 19.]

In support of this argument, Plaintiff attempts to distinguish this case from *E.S.S. v. Rock Star Videos,* wherein the Ninth Circuit found that the use of the name of a Los Angeles strip club had at least some artistic relevance to a video game whose goal was to "mimic the look and feel of actual Los Angeles neighborhoods." 547 F.3d at 1097. There, the game was decidedly not "about" the strip club, but since the strip club had some relation to the city of Los Angeles, the court found the use of the mark was entitled to First Amendment protection. *Id.* at 1100 ("[Only] the use of a trademark with no artistic relevance to the underlying work whatsoever does not merit First Amendment protection. In other words, the level of relevance merely must be above zero. It is true that the game is not 'about' the [strip club] . . . but given the low threshold the game must surmount, that fact is hardly dispositive.").

Despite Plaintiff's contention to the contrary, this case is analogous to *E.S.S.* Here, it is undisputed that the *Godfather* games are not "about" Tommy Guns; the games are about a fictional world, based on the *Godfather* novel and movies, [dkt. 87 at ¶ 3], wherein players act like criminals and mobsters who use a wide array of weapons—including Tommy Guns. Plaintiff does not dispute the relevance, or even the primacy, of Tommy Guns to the virtual world depicted in the *Godfather* games. Nor does Plaintiff dispute that the Dillinger name is closely associated with the Tommy Gun. Indeed, Plaintiff admits that there a "superficial and attenuated" link between John Dillinger and the *Godfather* video games. [Dkt. 144 at 12.]

As was the case in *E.S.S.*, even if the Court accepts the characterization as attenuated, such connection is enough to satisfy the *Rogers* test: The gentleman-bandit, commonly known for his public persona as a "flashy gangster who dressed well, womanized, drove around in fast

8

cars, and sprayed Tommy Guns," [dkt. 175 at 4], has above-zero relevance to a game whose premise enables players to act like members of the mafia and spray Tommy Guns. *See Roxbury Entmn't v. Penthouse Media Group, Inc*., 669 F. Supp 2d 1170, 1176 (C.D. Cal. 2009) ("Defendants have introduced evidence demonstrating at least some relationship between the mental imagery associated with the term 'Route 66,' e.g., road trips [and] cross-country travel, and the content of Defendants' movie . . . Plaintiff's argument that the association is tenuous does not controvert Defendants' showing.").

Plaintiff attempts to undermine this relationship by arguing that, "except for the name 'Dillinger,' [EA] chose not to include elements in its games which fell before 1940, such as John Dillinger's contemporaries (e.g., Bonnie & Clyde, Ma Barker, Machine Gun Kelly, pre-1940 Godfather movie characters and 1930s-era cars)." [Dkt. 182 at 4.]  Neglecting to include certain elements of an era, however, quite obviously does not mean that those which are included are irrelevant.

No suggestion has been made that the *Godfather* games aim to exactly replicate the *Godfather* movies or the time-period they depict—neither the fact that Dillinger lived before the pertinent time period nor the fact that EA did not include any of Dillinger's contemporaries undermines the relevance of Dillinger's public persona to the content of the games.

It bears repeating that it is not the role of the Court to determine how meaningful the relationship between a trademark and the content of a literary work must be; consistent with *Rogers,* any connection whatsoever is enough for the Court to determine that the mark's use meets "the appropriately low threshold of minimal artistic relevance."  875 F.2d at 999.  EA has certainly shown that the "mental imagery" associated with the Dillinger name has more than zero relevance to the content of the *Godfather* games.

## 2. EA's Institutional Memory of Its Subjective Intent

Plaintiff also argues that the Dillinger name is not relevant to the video games because neither Mr. Wade nor anyone he could locate at EA could remember why "Dillinger" was chosen to describe the Level Three Tommy Gun.[3]  [Dkt. 146-1 at 4, 5, 10-11.]  Plaintiff effectively asks the Court to infer that the apparent inability of EA representatives to recall why it chose to identify two of the weapons as Dillinger Tommy Guns means that there was no basis for identifying the weapons as such.  [Dkt. 144 at 8-12.]

But the Court's analysis of the relationship between Dillinger and the *Godfather* video games is not limited to the company's institutional memory of its original intent, or even to the intent itself.  As a legal matter, the relevant fact is that the company *did* choose to identify the Tommy Gun with the Dillinger name.  As Plaintiff admits, "fundamentally, the inquiry [regarding relevance] looks to whether there is an *actual* nexus between the use and the intellectual property," not just to memory of past intent.  [Dkt. 182 at 1 (emphasis added).]  As a practical matter, the mere fact that no EA representative can now recall why the guns were named "Dillinger Tommy Guns" may actually be more probative of the fact that there are countless artistic elements in the video games than it is of the relationship between Dillinger and the content of the games.  [*See* dkt. 87 at ¶ 10.]  In short, that no one can remember how the weapons were named has little-to-no bearing on any "actual nexus" between Dillinger and the content of the *Godfather* games.

---

[3] Plaintiff moves to strike the testimony of Mr. Wade regarding how the Dillinger name was selected for use in the games—namely, that a team of people at EA determined it would "make the game cool" and would not "feel out of place in the context of the game," [dkt. 87 at ¶ 20]—on the grounds that it is speculative and lacks proper foundation.  [Dkt. 144 at 9; dkt. 146-1 at 5 (Depo. pg. 73 at ¶ 8-14).]  Because Mr. Wade admits that his statements about the naming of the Tommy Gun is speculative, the Court **GRANTS** Plaintiff's motion to strike and will not consider this part of Mr. Wade's testimony.

The Court therefore finds that EA's inability to recall why it used the Dillinger name does not itself create a genuine issue of material fact regarding the name's relevance to the games. The Dillinger name has some relevance to the *Godfather* games and thus satisfies the first element of the *Rogers* test.

### B) Is the Dillinger Label Explicitly Misleading as to the Source and Content of the Games?

The second element of the *Rogers* test asks the Court to determine whether the defendant's use of the plaintiff's trademark "explicitly misleads as to the source and content of the work. 875 F.2d at 999. To be "explicitly misleading," the defendant's work must make some affirmative statement of the plaintiff's sponsorship or endorsement, beyond the mere use of plaintiff's name or other characteristic. *See Rogers*, 875 F.2d at 1001; *E.S.S.,* 547 F.3d at 1101. For example, the use of "the phrase in a subtitle of 'an authorized biography' would be sufficiently explicit to be actionable, if false"; but evidence that the trademark use "might implicitly suggest that the named celebrity had endorsed the work or had a role in producing it" is "outweighed by the danger of restricting artistic expression." *Rogers*, 875 F.2d at 999-1000.

Plaintiff argues that "by using Dillinger's name in the games, EA gives the false impression that the Dillinger brand approves the association of John Dillinger's likeness with these games; "[t]he fact that the games are based on literary and motion picture works that do not contain any reference to John Dillinger only heightens the probability of deception." [Dkt. 182 at 17; dkt. 164 at 15.] In support of its claim, Plaintiff points to the fact that the "Modern Dillinger" is one of only a select few guns available through the upgrade pack for *The Godfather II*, implicitly indicating it is "arguably the most powerful gun available," [dkt. 146-1 at 14], and that

press releases posted to EA's website list the Modern Dillinger first among all the weapons, [dkt. 146-2 at 7].[4] [Dkt. 164 at 15.]

In the same breath, however, Plaintiff urges the Court to believe that the games can be played "many times without interfacing with the Dillinger guns themselves." [Dkt. 182 at 7 (citing dkt. 187 at ¶ 17).] Furthermore, Plaintiff has presented no evidence that any consumer bought the *Godfather* Games because of the Dillinger name, or was otherwise confused. As was the case in *E.S.S.,* the use of the Dillinger name is "quite incidental to the overall story of the game" and "not the main selling point of the [g]ame." 547 F.3d at 1100-1101.

Even if the Dillinger name is not a selling point of the games, Plaintiff argues, "studies show that increasing numbers of consumers believe that all marks appearing in entertainment are placed or licensed."[5] [Dkt. 164 at 15, citing to Elizabeth Rosenblatt, *Rethinking the Parameter of Trademark Use in Entertainment*, 61 FLORIDA L. REV. 1011, 1032 (2009).] As an initial matter, this statement is not admissible evidence under Rule 801; but even if it were, it would not be probative as to whether the use of this particular trademark confused consumers. As to production of admissible evidence, Plaintiff futilely claims that "at trial, [it] will present numerous pieces of evidence as to post-sale confusion." [Dkt. 144 at 15.] Absent a Rule 56(d) motion, however, summary judgment is the time in the litigation for the parties to marshal and present the Court with all the evidence that they intend will prove their respective cases. See, e.g., Everroad v. Scott Truck Sys., Inc., 604 F.3d 471, 476 (7th Cir. 2010). And despite Plaintiff's sweeping allegation, it has presented no evidence that a single consumer was misled in this case.

---

[4] Plaintiff also argues that the Dillinger Tommy Gun is advertised on internet pages where the downloadable content can be purchased, such as Xbox and Playstation screen shots. [*See* dkt. 151-4; dkt. 151-5.] As EA points out, however, Plaintiff has made no showing that EA exercises control over these products or their advertising materials. [Dkt. 164.] The Court therefore disregards this evidence.

Instead, in support of its position, Plaintiff attempts to analogize this case to *Parks v. LaFace Records,* 329 F.3d 437 (6th Cir. 2003), where the Sixth Circuit determined that under the *Rogers* test, the title of Outkast's hip-hop song *Rosa Parks* was not protected by the First Amendment because it had no artistic relevance whatsoever to the content of the song and because it was likely to confuse the public about the content of the work. In striking contrast to Rosa Parks, whom the court noted was an "international symbol of freedom, humanity, dignity and strength," *id.* at 454, the court deemed the Outkast song "nothing more and nothing less than a paean announcing the triumph of superior people in the entertainment business over inferior people in that business." *Id.* at 435. Moreover, the court noted, "some people looking at the title *Rosa Parks* might think the song is about Rosa Parks, and for those with that false impression (as twenty-one consumer affidavits filed in this case indicate happened), the title is misleading." *Id.* at 455.

In determining that the Outkast song's title was not protected by the First Amendment, the *Parks* court focused on the objective evidence of relatedness and potential for consumer confusion. 329 F.3d at 455. And unlike *Parks*, where the plaintiff presented affidavits documenting circumstances in which the song's title led listeners to believe the song was about Rosa Parks, 329 F.3d at 455 n.4, here Plaintiff has presented no evidence that any consumers are confused by the use of "Dillinger" in the *Godfather* games. The Court cannot simply infer that the Dillinger name confuses the public, let alone that such confusion outweighs First Amendment concerns.

In any event, Plaintiff points to no *explicit* misrepresentation—that fact alone is dispositive of this issue. *Rogers,* 875 F.2d at 999; *E.S.S.* 547 F.3d at 1100-1101. All that is challenged here a single text-line used to identify one of many weapons within a visually complex video game comprised of countless artistic elements. [Dkt. 87 at ¶¶ 10-11.] In the face of no docu-

mented harm—or even risk of harm—whatsoever, the Court finds that there is no genuine issue of material fact regarding public confusion from the use of the Dillinger name.

Because no issue of fact exists as to whether the Dillinger name is relevant to the content of *The Godfather* Games, or as to whether the use of the name explicitly misleads consumers, the Court finds that EA is entitled to summary judgment on its First Amendment defense.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** EA's Motion for Summary Judgment on its First Amendment Defense with respect to all remaining claims, [dkt. 85], and further **DENIES** Plaintiff's Cross-Motion regarding the same, [dkt. 144]. Judgment shall enter accordingly.

06/16/2011

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Peyton Louis Berg
BOSE MCKINNEY & EVANS, LLP
pberg@boselaw.com

Keirian Antares Brown
TAFT STETTINIUS & HOLLISTER LLP
kbrown@taftlaw.com

Adam Clay
INDIANA ATTORNEY GENERAL
Adam.Clay@atg.in.gov

Marsha Stelson Edney
U.S. DEPARTMENT OF JUSTICE
marsha.edney@usdoj.gov

Ronald E. Elberger
BOSE MCKINNEY & EVANS, LLP
relberger@boselaw.com

R. Adam Lauridsen
KEKER & VAN NEST LLP
alauridsen@kvn.com

Melissa J. Miksch
KEKER & VAN NEST LLP
mmiksch@kvn.com

Erin C. Nave
TAFT STETTINIUS & HOLLISTER LLP
enave@taftlaw.com

Craig Eldon Pinkus
BOSE MCKINNEY & EVANS, LLP
cpinkus@boselaw.com

Jonathan G. Polak
TAFT STETTINIUS & HOLLISTER LLP
jpolak@taftlaw.com

R. James Slaughter
KEKER & VAN NEST LLP
rslaughter@kvn.com